**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HADEK PROTECTIVE SYSTEMS B.V. and HADEK PROTECTIVE SYSTEMS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>ERGON ASPHALT & EMULSIONS, INC.,<br><br>Defendant,<br><br>v.<br><br>A. DE KREIJ HOLDING, B.V. and ALBERT DE KREIJ,<br><br>Third-Party Defendants. | Civil Action No. 2:22-cv-1421<br><br>Chief Magistrate Judge Patricia L. Dodge |

**MEMORANDUM OPINION AND ORDER**

## I. Relevant Procedural History

Presently before the Court is the Motion to Exclude the Testimony of Hadek's Damages Expert Melissa Bizyak of Defendant Ergon Asphalt & Emulsions, Inc. ("Ergon") (ECF No. 109), which was supported by a Brief and Reply Brief. (ECF Nos. 112, 124.) Plaintiffs Hadek Protective Systems B.V. and Hadek Protective Systems, Inc. (collectively "Hadek") filed a Brief in opposition to the motion. (ECF No. 123.)

On September 29, 2025, the Court issued an Opinion and Order that denied in part Ergon's motion as it related to Ms. Bizyak's qualifications. (ECF No. 141.) Regarding the issues of reliability and fit, however, the Court concluded that a Daubert hearing was necessary to resolve these issues. A Daubert hearing was held on December 15, 2025, during which both Ms. Bizyak

and Mark Gleason, Ergon's expert, testified. Ergon and Hadek filed post-hearing briefs on February 4, 2026. (ECF Nos. 166 and 167, respectively.) Thus, this matter is ready for resolution.

## II. Relevant Background[1]

In connection with its claims against Ergon for breach of contract and tortious interference, Hadek asserts that it lost certain opportunities for the sale of PENNGUARD® products. Hadek retained Ms. Bizyak as an expert regarding its claimed damages. Her report, and the opinions expressed therein, are at issue here.

Ms. Bizyak's report states that her services were limited to the review of documents provided to her and the preparation of a report in which she expressed her opinions as to the damages incurred by Hadek in the form of lost profits. (ECF No. 112-1 at 2-3.) With respect to Hadek's breach of contract claim, she concludes that it sustained more than $20 million in lost profit damages with respect to missed opportunities in fourteen projects, as well as the MEPCO contract, and more than $11 million in damages related to the tortious interference claim. (*Id.* at 12, 13.)

Ergon asserts that Ms. Bizyak must be excluded as an expert because her opinions are unreliable and do not fit the facts of this case. Hadek disputes Ergon's contentions and argues that its expert's opinions comply with the requirements of Federal Rule of Evidence 702 and the holdings of *Daubert* and its progeny.

[1] As the Court is writing for the benefit of the parties, it will not provide an extensive summary of the history of this case or the claims and defenses that have been asserted. In addition, as the September 29, 2025 Memorandum Opinion and Order (ECF No. 141) includes a more fulsome discussion of these issues, it will not be repeated here.

## III. The Parties' Positions

A. Reliability

In their original brief, Ergon argued that Ms. Bizyak's opinions are unreliable because they are based on groundless assumptions. Ergon contended that the "fatal problem" regarding her reliance on Hadek's sales projections for its "missed opportunities" is that Ms. Bizyak neither understands the data used to gather the information used in these projections, nor the methodology Hadek employed. Instead, Ms. Bizyak simply relied on Hadek's methodology rather than performing any independent calculations or related analysis. Further, she did not change any of Hadek's calculations.

Hadek used the following methodology to develop its claimed lost opportunities on fourteen projects: identify highly similar projects on which it had previously worked (the "reference projects") and then make a projection that its sales and profits for lost opportunity projects would be the same on a per-square-meter basis. While actual numbers existed for the reference projects, they were not used; instead, pre-sale projections formed the basis for Hadek's projections.

According to Ergon, Ms. Bizyak did not independently review or test Hadek's projections. In fact, Ergon argues, there is nothing in her report that describes how the pre-calculation (or pre-sale) projections for the reference projects were developed. Instead, Ms. Bizyak merely accepted Hadek's representations that its pre-calculations were more conservative than the actual profits achieved on each project. Ergon therefore contends that Ms. Bizak's reliance on Hadek's determinations in lieu of conducting any independent analysis of the glass block market, as well as her failure to identify, test, or confirm the data, assumptions, and methodologies used in the sales projections, render her opinions unreliable.

In its post-hearing brief, Ergon asserts that Ms. Bizyak's testimony during the Daubert hearing confirmed that she "simply adopted Hadek's speculative assumptions, fanciful profit margins, and conveniently optimistic narrative wholesale," and did nothing more than "copying Hadek's arithmetic." (ECF No. 166 at 2.) Contrasting her hearing testimony with her previous deposition, Ergon suggests that Ms. Bizyak attempted to bolster her report by suggesting that she did, in fact, perform an independent evaluation. As evidence, it cites her testimony that she relied on a "global energy monitor" despite the fact that it is not mentioned in her report and was only mentioned in passing during her deposition testimony. Ergon also asserts that while Ms. Bizyak claimed during the hearing that she compiled the missed opportunities list and calculated Hadek's damages, her deposition testimony confirms that Hadek selected the reference projects and chose the numbers that were put into the pre-calculation worksheets. According to Ergon, Ms. Bizyak admitted during her deposition that she performed no calculations or market analysis and ignored alternative explanations for Hadek's inability to generate sales on the missed opportunities identified by Hadek.

In turn, Hadek countered in its original brief that the focus of whether an expert's opinions are reliable is whether those opinions are supported by "good grounds," not if they are supported by the best foundation or methodology. It asserted that Ms. Bizyak's damages calculation is, in fact, reliable. According to Hadek, Ms. Bizyak's process started with her creation of three qualitative criteria—project similarity, geographic history, and prior customer relationship—that had to be met for a project to be included in the missed opportunities. Hadek argued that these criteria bear a reasonable relationship to its chances of making a sale, and it merely provided Ms. Bizyak with the requisite support based on the criteria that she created.

Hadek also contends that Ergon's reliability argument ignores her testimony on this issue. Rather than rubber stamp Hadek's calculation as Ergon suggests, Ms. Bizyak relied on information supplied by Hadek, as she is permitted to do under Rule 702. Moreover, when she needed additional information, she requested it and reviewed it before proceeding.

In its post-hearing brief, Hadek asserts that Ms. Bizyak's analysis is project-specific and conditioned on a finding of causation and liability. Thus, once specific projects are identified in her analysis, the jury will determine whether the lost opportunities would have gone to Hadek but for Ergon's conduct. When an expert like Ms. Bizyak assumes liability and causation, Rule 702 requires only that the expert's assumptions have "some support," and an expert is permitted to base their opinions on a particular version of the disputed facts.

The Court notes that prior to Ms. Bizyak's involvement, Hadek calculated what it believed to be its lost profits with respect to 15 projects. (ECF No. 123, Ex. 8.) According to Hadek, it did so by using pre-calculation profit per square meter for PENNGUARD® products sold on certain reference projects and actual inspection sales on the same projects. (ECF No. 123 at 5.) This resulted in a calculation of lost profits in the amount of $22,959,024.00.

Ms. Bizyak states in her report that she was advised that Hadek became aware of lost opportunities on fourteen projects in the territories covered by the Master Agreement, 11 of which used PENNGUARD®. She notes that Hadek is "confident" that it could successfully convert these projects. Further, the location of the projects and Hadek's relationship with relevant parties "provides a high degree of certainty that the projects would have been awarded to Hadek" but for Ergon's breach of the Master Agreement.

In quantifying her lost profits calculation for Hadek's breach of contract claim, Ms. Bizyak describes her process as follows:

> The determination of lost profits associated with the missed opportunities attendant to the subject 14 projects, all within the geographic areas granted by the Master Agreement and during the term of exclusivity with Defendant, include consideration of the PENNGUARD® product recommended by Plaintiffs for the project, surface size (measured in square meters) of each project, as well as the contribution margin income per square meter (SQM) realized by Plaintiffs on highly similar projects ("Reference Projects"). Inspection income, net of expenses, was also included. Price calculation sheets associated with each Reference Project was provided by Plaintiffs. Using the price calculation sheets is deemed to be a conservative measure of lost profits, as final figures deviate from pre-calculated amounts primarily due to additional used of materials resulting in additional sales, which have not been considered herein.

(ECF No. 112-1 at 8.) Ms. Bizyak's calculations are presented in Exhibit B to her report and total $20,551,758 for lost profits related to the contract claim. In reaching this result, she rejected a fifteenth project and reduced her calculations by Hadek's avoided costs for inspection services.

B. Fit

According to Ergon, Ms. Bizyak's "fit" to the facts of this case is "much too loose" to permit testimony about what would have actually happened if Hadek had bid on certain projects. Ergon asserts that her calculation of lost profits is based on Hadek's unsubstantiated projections and that she did no analysis to verify the reasonableness of these projections. Further, Ms. Bizyak failed to account for alternative explanations of why Hadek did not obtain certain projects, such as the customer's preferences, including those for products other than the PENNGUARD® products that Hadek sold. Thus, it argues, because her damages calculations are merely speculative without any reliable methodology, her testimony would not be helpful to the trier of fact.

In response, Hadek asserts that Ergon's "fit" arguments are principally a repetition of its reliability arguments and are best suited for cross-examination at trial. It does note, however, that Ergon has failed to demonstrate that an expert's opinion should be excluded because her damage calculations are very similar to those already done by the lay party which retained her. It also represents that Ms. Bizyak will not offer an opinion to the jury that it is more likely than not that

Hadek would have converted the missed opportunities into sales. Rather, it is Hadek's burden to do so, and if it succeeds, then Ms. Bizyak's damage calculations will allow the jury to place a value on the missed opportunities that are proven by Hadek at trial.

## IV. Legal Standard

A detailed summary of the legal standards at issue is provided in the Memorandum Opinion related to Ms. Bizyak's qualifications (ECF No. 141) and will not be repeated here. Appropriate legal analysis will be provided herein as required.

## V. Analysis

Among the fundamental issues presented here are the methodology Ms. Bizyak states that she used to render her opinions, the nature and extent of the work she independently performed, and whether the opinions she has rendered are reliable and fit the facts of this case.

As noted in Rule 702 of the Federal Rules of Evidence, an expert may testify to her opinions if, among other things, the testimony is based on sufficient facts, is the product of reliable methods, and the expert has reliably applied these methods to the facts of the case. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999). The testimony must be reliable and relevant. *See UGI Sunbury LLC v. A Permanent Easement*, 949 F.3d 825, 832 (3d Cir. 2020).

In an earlier ruling, the Court determined that Ms. Bizyak was qualified to render opinions in this case. (ECF No. 141.) After doing so, the court, acting as the gatekeeper, must determine whether an expert's testimony is reliable. *Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 589 (1993). As the Third Circuit has explained, "district courts perform a gatekeeping function to ensure that expert testimony meets the requirements of Federal Rule of Evidence 702." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017). In assessing reliability, while the

testimony need not be supported by the best foundation or methodology, it must be supported by "good grounds." *UGI Sunbury*, 949 F.3d at 834 (citation omitted).

Ms. Bizyak principally based the calculation of Hadek's lost profits on fourteen specified "lost opportunity" projects. She states that she required three criteria for their inclusion: similarity to other projects on which Hadek had worked; the project's geographic location; and Hadek's prior relationship with the customer. Notably, however, Hadek had already chosen the fourteen lost opportunity projects, plus another that was ultimately excluded by Ms. Bizyak, before her involvement. To the extent that Ms. Bizyak created her own methodology, it appears to have been done to align with or back into work that Hadek had already performed. Thus, rather than independently construct a damages model, she simply adopted Hadek's.

Hadek also identified, without any input from its expert, the so-called reference projects that it used as part of its process of calculating damages. Hadek calculated lost profit damages on the lost opportunity projects by projecting that the sales and profits would be the same as the reference projects on a per-square-meter basis. Ms. Bizyak accepted and used the reference projects that had already been selected by Hadek in her own calculations. She did not review any of the other eighty similar projects (as referenced in Exhibit A to her report) to conduct an independent analysis of these alternative potential reference projects. Ms. Bizyak therefore similarly adopted Hadek's chosen reference projects into her own calculations absent any independent evaluation or assessment.

Hadek also prepared pre-sale calculation worksheets with respect to the reference projects. Ms. Bizyak's report sheds no light on how Hadek developed these calculations. Nonetheless, she used the pre-sale calculation worksheets that Hadek prepared to calculate damages. While actual numbers were available for the reference projects, Ms. Bizyak instead chose to use Hadek's pre-

sale calculations based on her assumption that they would be more conservative than the actual results achieved. She did not reliably test this assumption.

Ms. Bizyak also assumed that Hadek would have converted 100% of the fourteen lost opportunities into sales. She did so despite the fact that in some of the lost opportunity projects, the product specified by the customer that was ultimately used to complete the project was not a PENNGUARD® product or was not the only PENNGUARD® product sold by Hadek. Further, she failed to consider or account for the fact that in certain projects, although Hadek had bid on the project, its bid was not ultimately selected. Despite these known circumstances, Ms. Bizyak failed to account for, or to even consider, any alternative explanation for Hadek's failure to obtain these projects. She also failed to address the possibility that Hadek might not achieve all fourteen projects. Instead, her assumptions appear to have been based merely on Hadek's own confidence that it would have converted all fourteen lost opportunities. None of this adequately supports Ms. Bizyak's "high degree of certainty" that the projects would have been awarded to Hadek (ECF No. 112-1 at 8) but for Ergon's conduct.

Having reviewed her report, her deposition testimony, and her testimony at the Daubert hearing, the Court concludes that Ms. Bizyak's expert opinions must be excluded. Her methodology was flawed. As a starting point, Hadek had already pre-selected the lost opportunity projects before her work began.[2] Hadek's controller testified that Hadek selected the lost opportunity projects, selected the reference projects, and then used the pre-sale calculations for these projects to calculate lost profits. (ECF No. 112-3 at 27:1-30:2, 31:1-19; ECF No. 112-4 at 508:2-16, 511:14-19; 526:7-13; 545:21-548:2.) Ms. Bizyak did not select the reference projects.

---

[2] The Court recognizes that Ms. Bizyak eliminated one project and certain inspection costs. Nonetheless, the majority of her work simply parroted what Hadek had already done and did nothing to cure the underlying flaws in her methodology or the application of this methodology.

(ECF No. 112-2 at 42-43.) Indeed, her criteria for including lost opportunity projects in her calculation of damages merely incorporated the criteria already used by Hadek in its pre-selection. She did not create the pre-sale calculation worksheets and did no analysis of them other than checking the math. (ECF No. 112-2 10-11.) She did not consider using actual financials based on her assumption that they were more conservative.

Thus, with minor exceptions, Ms. Bizyak assumed and used 100% of the numbers provided by Hadek. She also concluded, in the face of contradictory facts, that 100% of the lost opportunity projects selected by Hadek would turn into a sale. While Hadek interprets this as her assumption of causation, which she would be permitted to do, an expert cannot simply disregard an undisputed set of facts if they don't support her conclusions without an adequate explanation. *See UGI Sunbury*, 949 F.3d at 833-34 (quoting *Karlo*, 849 F.3d at 80-81) ("Rule 702's reliability threshold requires expert testimony to be 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.'"). Simply relying on Hadek's confidence in acquiring 100% of the lost opportunities without any due diligence is unreliable.

While Hadek is correct that an expert can rely on factual information provided by a party, even if disputed, Ms. Bizyak's reliance goes well beyond that. In essence, she accepted what Hadek prepared, provided, or told her without conducting meaningful due diligence, testing Hadek's assumptions, or seeking independent verification. Her methodology was not only client-constructed, but except in minor ways, she merely re-calculated the work that was already done by Hadek.

Simply put, Ms. Bizyak did not create an independent damage model or apply it reliability to the facts. As a result, her testimony would not be helpful to the trier of fact. *See Pineda v. Ford*

*Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). And for that reason, her opinions will be excluded at trial.

THEREFORE, this 8th day of October, 2026, it is hereby ORDERED that the Motion to Exclude the Testimony of Hadek's Damages Expert Melissa Bizyak is GRANTED. Melissa Bizyak is excluded from providing expert testimony in this case.

BY THE COURT:

/s/ Patricia L. Dodge
PATRICIA L. DODGE
CHIEF UNITED STATES MAGISTRATE JUDGE